UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

v.                                                                    CASE NO,: 3:05-cr-41-J-25HTS

GUSTAVO ADOLFO CARDENAS

### DEFENDANT CARDENAS'S MOTION FOR DOWNWARD DEPARTURE

### FACTUAL STATEMENT

This is a classic drug case in which Mr. Cardenas, succumbed to the financial lure necessary to maintain his family and his pregnant wife. The defense is requesting a reduction in sentence based on several combinations of circumstances detailed below. It is important to note that Mr. Cardenas has no criminal history in this country or Columbia. He has had a good work history and was truthful about his offense in post-arrest statements. Mr. Cardenas is a business owner in Columbia and has strong sense of family values. His family has suffered tremendous hardship which is detailed in the enclosed letter (Exhibit "A").

### LEGAL AUTHORITIES

On January 12, 2005, the Supreme Court ruled that its Sixth Amendment holding in Blakely v. Washington, 124 S. Ct. 2531 (2004) and Apprendi v. New Jersey, 530 U.S. 466 (2000) applies to the Federal Sentencing Guidelines. United States v. Booker, 125 S. Ct. 738, 756 (2005). Given the mandatory nature of the Sentencing Guidelines, the Court found no relevant distinction between the sentence imposed pursuant to the Washington statutes in Blakely and the sentences imposed pursuant to the Federal Sentencing Guidelines in the cases before the

Court. Id. at 751. Accordingly, reaffirming its holding in <u>Apprendi,</u> the Court concluded that [a]ny fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt.  Based on this conclusion, the Court further found those provisions of the federal Sentencing Reform Act of 1984 that make the Guidelines mandatory, 18 U.S.C. ' 3553(b)(1) or which rely upon the Guidelines's mandatory nature, 18 U.S.C. ' 3742(e), incompatible with its Sixth Amendment holding. <u>Booker,</u> 125 S. Ct. at 756. Accordingly, the Court severed and excised those provisions, making the Guidelines effectively advisory. Id. at 757.  Instead of being bound by the Sentencing Guidelines, the Sentencing Reform Act, as revised by <u>Booker,</u> requires a sentencing court to consider Guidelines ranges, see 18 U.S.C.A. ' 3553(a)(4) (Supp.2004), but it permits the court to tailor the sentence in light of other statutory concerns as well,  See ' 3553(a).  <u>Booker,</u> 125 S. Ct. at 757. Thus, under <u>Booker,</u> sentencing courts must treat the guidelines as just one of a number of sentencing factors set forth in 18 U.S.C. ' 3553(a).  The primary directive in Section 3553(a) is for sentencing courts to impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph 2. Section 3553(a)(2) states that such purposes are:

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)  to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

In determining the minimally sufficient sentence, ' 3553(a) further directs sentencing courts to consider the following factors:

1)  the nature and circumstances of the offense and the history and characteristics of the defendant (' 3553(a)(1);

2)  the kinds of sentences available (' 3553(a)(3);

3)  the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct (' 3553(a)(6); and

4)  the need to provide restitution to any victims of the offense. (' 3553(a)(7).

Other statutory sections also give the district court direction in sentencing. Under 18 U.S.C. ' 3582, imposition of a term of imprisonment is subject to the following limitation: in determining whether and to what extent imprisonment is appropriate based on the Section 3553(a) factors, the judge is required to recognize that imprisonment is not an appropriate means of promoting correction and rehabilitation (emphasis added).  Under 18 U.S.C. ' 3661, no limitation shall be placed on the information concerning the background, character, and conduct of [the defendant] which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence (emphasis added). This statutory language certainly overrides the (now-advisory) policy statements in Part H of the sentencing guidelines, which list as not ordinarily relevant to sentencing a variety of factors such as the defendant's age, educational and vocational skills, mental and emotional conditions,  drug or alcohol dependence, and lack of guidance as a youth. *See* U.S.S.G. ' 5H1. The directives of Booker and ' 3553(a) make clear that courts may no longer uncritically apply the guidelines. Such an approach would be inconsistent with the holdings of the merits majority in Booker, rejecting mandatory guideline sentences based on judicial fact-finding, and the remedial majority in Booker, directing courts to consider all of the 3353(a) factors, many of which the guidelines either reject or ignore.  Thus, logic compels the conclusion that the sentencing judge, after considering the recited factors (including the guidelines), has

full discretion, as full as what he possessed before the Act was passed, to sentence anywhere within the statutory range. In sum, in every case, a sentencing court must now consider all of the ' 3553(a) factors, not just the guidelines, in determining a sentence that is sufficient but not greater than necessary to meet the goals of sentencing, and where the guidelines conflict with other sentencing factors set forth in ' 3553(a), these statutory sentencing factors should generally trump the guidelines.

Pursuant to 18 U.S.C. 3553(b) this court has the discretion to depart in this case. The court may depart down below the guidelines if the court finds "that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." 18 U.S.C. ' 3553(b), The Guidelines Commission noted at ' 5K2.0 that, "[c]ircumstances that may warrant departure from the guidelines pursuant to this provision cannot, by their very nature, be comprehensively listed and analyzed in advance. . . "

Other than departures based on race, sex, national origin, creed, religion, socio-economic status, and physical condition, the Commission has not limited the kinds of factors that could constitute grounds for departure in an unusual case. Koon v. United States, 518 U.S. 81;135 L. Ed. 2d 392, 116 S. Ct. 2035, 2043, 2046-48 (1996).

In cases throughout the land, courts have approved of a combination of factors which the court can utilize for proper departure. The courts have stated:

> There is no reason to be so literal-minded as to hold that a combination of factors cannot together constitute a "mitigating circumstance." Given the Sentencing Commission's acknowledgment of "the vast range of human conduct" not encompassed by the Guidelines, a unique combination of factors may constitute the "circumstance" that mitigates. This conclusion is, indeed, required by the Guidelines themselves. The Commission says, in its formal treatment of departures, that the

> departure is to occur when "a court finds an atypical case," one "where conduct significantly differs from the norm." U.S.S.G. Ch. 1, Pt.A, ' 4(b). What the Commission has focused on is "the case" conduct. Neither case nor conduct can be reduced to a single factor. Case and conduct are a total pattern of behavior.
>
> In making a decision in any particular case, good judgment will often require the evaluation of a complex of factors. No single factor may be enough to point to the wise course of decision. But a wise person will not look on each particular factor abstractly and alone. Rather, it will be how the particular pieces fit together, converge, and influence each other that will lead to the correct decision.

The defense contends that Mr. Cardenas is an appropriate candidate for a downward departure from the guidelines and/or any mandatory minimum sentence. The nature and circumstances of the instant offense demonstrate that Mr. Cardenas is not a sophisticated criminal and is regarded as the least culpable. Mr. Cardenas is a stable and productive member of his community in Columbia. Mr. Cardenas has cooperated with the government at the time of his arrest and throughout the entire criminal justice process. Mr. Cardenas appears likely not to re-offend and poses no danger to his community. Mr. Cardenas' involvement in the instant case clearly demonstrates aberrant behavior.

Mr. Cardenas' role in the offense, along with his background, his lack of any prior record, finds that there are "unusual circumstances" in this case, which make the Sentencing Guideline level inadequate even if the guidelines are advisory..

## A. **DEPARTURE FOR ABERRANT BEHAVIOR IS APPROPRIATE**

Aberrant behavior, that is criminal behavior where otherwise law-abiding people engage in conduct that is uncharacteristic, has been held by many of the circuit courts to be a proper grounds of departure. The courts have opted instead for a broad view of aberrant behavior. They require reviewing courts to employ the totality of the circumstances test in making aberrant behavior determinations. Under this test, courts consider a variety of mitigating factors, such as

6

pecuniary gain to the defendant, prior good deeds, and an effort to mitigate the effects of the crime in evaluating whether a defendant's conduct was unusual or, more specifically, "aberrant."

Mr. Cardenas has no criminal history nor any law enforcement contacts in the United States or Columbia. This was out of character for him and an aberration departure is appropriate.

**B. <u>DEPARTURE AS A DEPORTABLE ALIEN IS APPROPRIATE</u>**

Downward departure may also be applicable, however, if the court finds that a downward role adjustment is appropriate. Mr. Cardenas is a deportable alien who is likely to have his sentence increased in severity because of his status as an illegal.

The International Covenant and Civil and Political Rights Treaty was ratified by the United States June 8, 1992, has been ratified by 144 other nations, including Mr. Cardenas's country of Columbia. First Article VI, clause two of the Supremacy Caluse declares that all treaties made are the supreme law of the land. Moreover, international law are considered binding law in the United States and thus our courts. Article 26 of The International Covenant and Civil and Political Rights Treaty prohibits any discrimination and guarantees to all persons equal an effective protection against discrimination against any ground such as race, color, language, national origin, birth or status. Mr. Cardenas's imprisonment as a foreign national will have a disparaging impact on his sentence because the Bureau of Prisons will not grant Shock Incarceration, alcohol and drug counseling benefits nor allow him to spend time in a half way house, these are but a few factors that could reduce Mr. Cardenas's sentence. Furthermore, his INS hold will mean that even after Mr. Cardenas has fullfilled all the requirements of his sentence, he will be detained for additional months awaiting deportation to Columbia. Thus, because of his race, country of nationality and status, Mr. Cardenas's sentence will be more severe than any other sentence imposed in this case.

7

## C. **EXTRAORDINARY FAMILY SITUATION**

As the Honorable Court can discern from Ms. Valencia's letter, Mr. Cardenas and his family's file in Columbia has been one of hardship. His father passed away when Mr. Cardenas was very young. A sentence of any length would place a tremendous burden on his family and others in light of this situation. This District as well as the Seventh Circuit has recognized this type of family situation as grounds

## D. **A "COURIER" DEPARTURE IS APPROPRIATE**.

In United States v. Valdez-Gonzalez, 957 F.2d 643 (9th Cir. 1992), the Ninth Circuit upheld a district court's downward departure due to "the relative blamelessness of drug `mules'." Id. at 2194.

In Valdez-Gonzalez, the Ninth Circuit reviewed the sentences of two individuals convicted of possession with intent to distribute a controlled substance. Both of the defendants in Valdez-Gonzalez were poor Mexican citizens who had agreed to drive a vehicle containing marijuana for a sum of money. For instance, Luis Armando Valdez-Gonzalez supported a wife and four children by selling clothes from the back of a truck in Sonora. He was offered $2,000 to drive a load of marijuana. Similarly, Victor Arguelles-SOLIS was also a Mexican citizen from Sonora. He worked as a temporary manual laborer and field hand. He, too, agreed to drive a load of marijuana. He was to be paid $1000.

The district court departed downward in both of these cases due to the defendants' status as "mules." In so doing, the district court compared the activity of "mules" to other participants in more sophisticated conspiracies. See Valdez-Gonzalez. In addition, the district court also noted the potential unfairness in severe sentences for individuals living near the Mexican Border due to their dire economic situation. Id.

8

The Ninth Circuit upheld both of these departures in Valdez-Gonzalez. The Valdez-Gonzalez court identified two separate potential bases for downward departure in the "mule" context. Although the district court had ruled that no role adjustments were available because there were no other participants, Valdez-Gonzalez explicitly recognized "the possibility of downward departures based on a defendant's role in conduct extending beyond the offense of conviction, at least where the offense of conviction precludes a downward adjustment under section 3B1.2". Id. at 2197 (citing United States v. Bierley, 922 F.2d 1061, 1069 (3d Cir. 1990)). Therefore, where no role adjustment is possible, the Court may nonetheless depart downward due to the "mule's" role in drug smuggling activity that may extend beyond the offense of conviction.

Downward departure may also be applicable, however, if the court finds that a downward role adjustment is appropriate. The Valdez-Gonzalez court held that "[d]ownward departures may also be warranted on the ground that, even when the section 3B1.2 downward adjustment is available to a defendant, the defendant's role in criminal activity is so remote that relative blamelessness `is present to a degree substantially in excess of that which ordinarily is involved in the offense.'" Id. (quoting United States v. Alba, 933 F.2d 1117, 1121-22 (2d Cir. 1991)). Thus, downward departure is available regardless of whether a role adjustment is granted.

In short, the Valdez-Gonzalez court concluded that "the role in the drug trade played by `mules' may constitute a mitigating circumstance of a kind or to a degree that the Sentencing Commission did not take into consideration in formulating the Guidelines."

**WHEREFORE**, Mr. Cardenas respectfully requests the Court to consider this memorandum and impose the minimum sentence possible or downward depart from the applicable guidelines.

9

          *Respectfully submitted,*
          THE LAW OFFICE OF
          ROLAND FALCON

          /s/Roland Falcon
          Roland Falcon
          Florida Bar No. 118516
          1542 N. Pearl Street
          Jacksonville, Florida 32206
          Telephone: 904.614.4040
          Facsimile: 904.358.6610
          Rolandfalcon@rfalconlaw.com

**CERTIFICATE OF SERVICE**

    **I HEREBY CERTIFY** that a copy of the foregoing has been furnished to the following by ( ) hand delivery ( ) U.S. mail ( ) facsimile (X) electronically on June 17th, 2005:

U.S. Attorney's Office
300 N. Hogan Street
Suite 700
Jacksonville, FL 32201

          /s/Roland Falcon
          ATTORNEY

May 7th, 2005

Your Honor

My name is Claudia Valencia and I would like to take a moment of your time to tell you about my brother Gustavo and our family. Gustavo will be sentenced by you this coming 22nd of June.

Gustavo, my sister Liliana and I grew up and were raised in Bogotá, Colombia. We were an average working family who enjoyed Christmas and celebrated each other birthdays. In a few words, we were as normal as one family could possibly be. We lived a healthy life until our father passed away.

My mother and father worked very hard to provide us with a good living and both were fortunate enough to become self-employed early on in their relationship. At the time my father worked at a local bank and my mother stayed home and took care of us. My mother always believed in working for herself and soon thereafter they started their own business.

My father was an intelligent business man who designed a line of cosmetic products that he developed, marketed and distributed locally with the help of my mother. Among these products were lipstick balm, men's cologne and nail polish remover. Their hard work paid off and the products were somewhat successful in the local market. Later on my father brought into the business a partner we did not know well and did not trust either.

On February 16 1988, I received a phone call from a neighbor telling me that my father had been shot and killed in front of his business office. Everything in our lives changed forever. We tried to forget about it and to simply move on with our lives. Gustavo took refuge in sports, but four months after my father's death a taxi driver ran him over and left him almost paralyzed. He stayed in the hospital for over two months and it took him almost two years to fully recover. In the process of paying Gustavo's hospital bills and trying to make sense of my father's business debt, we lost everything we had. We lost the house, which was paid for, we also lost a small lab where the production of our line of cosmetics took place and we almost lost ourselves as well. We literally went through hell.

We learnt that the death of our father was a brutal act of greed and human selfishness and the individual who shot him never served a day in jail. We separated from each other. My mother and my sister lived in a small room they rented with whatever Liliana earned working as a sales rep. at the time. I moved with a college friend whom allowed me to stay in an empty room they had in their home and Gustavo did the same with another of his friends.

Colombia twenty years ago was a place with a lot of good and a lot of bad. It was and still is a place with a government that lacks the programs and resources necessary to help families with needs such as those we were confronted with at the time.

After my father's death we continued working mainly with the nail polish remover to make ends meet. We worked 7 days a week with my mother promoting it in local supermarkets but after a while competition made it very difficult for us to continue. Shortly thereafter Gustavo, my sister and my mother opened a small fast food cafeteria in a local army reserve. They worked together just as hard as they had before. For four

years it provided them with a decent living but with the change of administrations in the reserve, it also came to an end.

After all the adversity and hardships that we faced, our mother provided us, as well as she could, with a decent living and was able to raise us with good values and morals.

My mother ultimately became an artist. Liliana completed her bachelors in business administration and currently works in the retirement and finance sector. She travels at least twice a year to the U.S for business purposes. I came to the U.S. in 1995 and married my husband. I have worked for Bank of America for the past 8 years and I am presently finishing my Masters in Counseling Psychology. Gustavo paid for his own education and earned a degree in Graphic design in Colombia. He married his girlfriend of just about all his life, and less than two years ago opened a small gym in partnership with a friend. As of the writing of this letter his first son was born April 29, 2005.

…AND SO WE ASKED OURSELVES WHAT HAPPENED…

My husband believes that the fact that Gustavo never had a fatherly figure through out his life, sort of a big brother that he could relate to might have been the problem. Al says that Gustavo was or seemed very introverted and he also noticed the few times we visited my mother in Colombia, that Gustavo was having trouble handling his relationship with his mother. Because he lacked a fatherly figure, my husband thinks he was easily influenced by his so called "friends". In my husband's opinion Gustavo came in contact with people he should have never come in contact with.

Liliana sees Gustavo as a quiet person who always tried to overcome the obstacles that came his way with discipline and hard work. She believes that Gustavo was always aware of his limitations and having and absent father caused a profound change in his outlook of life. A couple of years ago, Gustavo took some neuro-linguistic courses to help him lessen the burden of an absent father and to enhance his communications skills. Liliana also believes that Gustavo met not long ago some very unfortunate people that influenced him in a bad way and made him commit the worst mistake of his life. One from which he says he has repented and learned a valued lesson too.

Finally I believed that my brother is a good man who, as he put it in one of his letters from jail "in a moment of weakness I was blinded by greed, and committed this foolish and terrible mistake". I see Gustavo as a person who has carried a huge baggage for a long time and who has struggled every single day to be a better person. We all had. He writes me from jail and tells me he only wanted and still wants a simple life. A life with no fears that allow him to act under his own convictions and allow him to respect life for what it is and to enjoy every little moment to its fullest, recognizing that material things are not as important as the spiritual ones. By this he means, family, companionship, love, etc. I think this is his opportunity to search deep within himself and change everything he wanted to change and start a new life. It sounds funny, but the Lord works in mysterious ways.

Your honor, Gustavo writes as often as he can. I in turn read all his letters to my mother, my sister and his wife. He writes in his letters how much he's been thinking and reflecting on all the unresolved issues he's got to deal with. He tells us he reads the bible constantly, which helps him with his thoughts and well being and constantly asks for his son. When he calls which is once every week and on Sundays (I can only afford certain

number of his calls) he tries to keep his composure but shortly into the conversation he breaks down in tears. In reading his letters I can tell how sorry he is for what he's done and how he regrets being where he is.

Thank you for taking the time to read this letter. We ask you to have mercy on Gustavo.